PAUL B. MELTZER - #77425
LAW OFFICES OF PAUL B. MELTZER
A Professional Corporation
511 Water Street
Santa Cruz, California 95060
Telephone:  831/426-6000

Attorney for Defendant, ROBERT SCOTT WEST

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA CRUZ

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: CR 08-00709-1 (JW) |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM & MOTION FOR** |
| vs. | ) | **DOWNWARD DEPARTURE** |
| | ) | |
| ROBERT SCOTT WEST, | ) | |
| | ) | |
| Defendant | ) | |

ROBERT SCOTT WEST respectfully submits this memorandum asking that the court depart downward from the guidelines and sentence him to three years probation with 10 months of electronic monitoring.

Like the government, Mr. West agrees with the factual findings and sentencing guideline calculations set forth in the Probation Office's Presentence Report ("PSR"). See Government Sentencing Memorandum at p. 2. Mr. West's crime of possessing stolen trade secrets merits a base offense level of 6, an 8-level enhancement due to a $100,000 loss amount, and a 2-level downward adjustment for acceptance of responsibility. Id.; PSR at ¶¶ 27-31. This yields a final adjusted offense level of 12.

Given Mr. West's lack of any criminal history, the Probation Office calculated a guideline range of 10 to 16 months, but it also recommended that the court depart downward to three years probation with 10 months electronic monitoring based on Mr. West's personal history, family circumstances, deportability, and payment of restitution. See Probation Office Sentencing Recommendation at pp. 1-3. Along similar lines, the victim in this case, Philips Lumileds Lighting Company ("Philips"), has

stated that it does not object to Mr. West "serving his sentence on electronic monitoring." Id. at p. 2.

The government concedes that Mr. West deserves a downward departure, albeit a smaller one, for extraordinary acceptance of responsibility. See Government Sentencing Memorandum at p. 2.  The government recommends that Mr. West serve four months in prison and four months home detention. Id.

Mr. West asks that the court reject the government's insistence that he serve jail time and instead embrace the Probation Office's sentencing recommendation.  Mr. West requests a downward departure to probation because: (1) his crime was an aberration from an otherwise law-abiding life; (2) his extraordinary family circumstances make imprisonment excessively harsh; (3) his deportability would substantially increase the severity of imprisonment for him; and (4) he has made extraordinary restitution and has cooperated fully with the government.

      **1.**        **Mr. West deserves a downward departure because his crime marked an aberration from an otherwise law-abiding life.**

The Sentencing Guidelines authorize a court to depart downward for "aberrant" behavior in "exceptional" cases. U.S.S.G. § 5K2.20(a)&(b).  A crime qualifies as aberrant if it was a "single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. §5K2.20(b).  The "single criminal occurrence" requirement is a "relaxed one." U.S.S.G. supp. to appx. C, amend. 603, commentary, "Reason for Amendment."  A crime can qualify as a "single criminal occurrence" even if it involved more than a "single criminal act"; the crime just has to satisfy §5K2.20's other three elements. Id.

A crime can be committed "without significant planning" under §5K2.20(b) even if it is not "spontaneous and seemingly thoughtless." Id.  Thus, in United States v. Smith, 387 F.3d 826, 834 (9th Cir. 2004), the Ninth Circuit ruled that no "significant planning" occurred in a witness retaliation case even though the defendant knew about the witness's accusations for "some time" (i.e., weeks, possibly months) before going to the witness's home to threaten her.  See also United States v. Gonzalez, 281 F.3d 38, 47-48 (2d Cir. 2002) (approving downward departure for aberrant behavior in embezzlement case where defendant had a month to plan his crime).

As to § 5K2.20's "limited duration requirement", whether a "crime's duration is 'limited' or not depends on the context." United States v. Hued, 338 F.Supp.2d 453, 459 (S.D.N.Y. 2004) (stressing defendant's passivity, the court departed downward under §5K2.20 even though the defendant allowed her boyfriend to store drugs in her apartment for three weeks). A crime does not have to be instantaneous to satisfy the "limited duration" requirement. See, e.g., United States v. Vieke, 348 F.3d 811, 813-14 (9th Cir. 2003) (refusing to overturn downward departure for aberrant behavior in credit card fraud case that lasted several years and involved multiple acts). See also United States v. Caldwell, 295 Fed. Appx. 689, 693 (5th Cir. 2008) (lower court granted §5K2.20 departure for defendant who spent two months trying to violate export control regulations), cert. denied, __ U.S. __, 129 S.Ct. 1635 (2009).

A defendant can satisfy §5K2.20's third aberrancy requirement as long as he has no criminal history. See, e.g., United States v. Castro-Hurtado, 68 Fed. Appx. 106, 108 (9th Cir. 2003) (departing in drug case where defendants had no "criminal history of any kind").

Even if a crime qualifies as aberrant, the court can only depart downward under §5K2.20 in "exceptional" cases. U.S.S.G. §5K2.20. See also United States v. Guerrero, 333 F.3d 1078, 1082 (9th Cir. 2003). To determine whether a case is "exceptional", a court may consider the defendant's employment record, motivation for committing the offense, and efforts at mitigation. U.S.S.G. §5K2.20 at n. 3. See also United States v. Castano-Vasquez, 266 F.3d 228, 235 (3d Cir. 2001); United States v. Watson, 454 F.Supp.2d 271, 275 (E.D.Pa. 2006). Thus, in United States v. Mellert, No. CR 03-0043, 2003 W.L. 22025007, *3 (N.D.Cal. July 30, 2003), the court based a §5K2.20 departure in an insider trading case on, inter alia, defendant's "outstanding employment record", remorse, and efforts at mitigation.

Here, Mr. West deserves a downward departure under §5K2.20. Mr. West's crime was an aberration. It did not involve "significant" planning. Indeed, like the crime at issue in Smith, Mr. West's crime "was not one for which 'significant planning' would ordinarily be required." Smith, 387 F.3d at 833. Mr. West did not engage in some nefarious, ongoing scheme with his prospective employer, Bridegelux, to exploit Philips' secrets. Nor did he hack into Philips' system to ransack its intellectual property. Instead, the night before quitting his job at Philips, Mr. West simply

copied files to which he already had access. See PSR at ¶ 10.   This just required pushing a few buttons, nothing more.

Moreover, Mr. West's crime, viewed in context, was of limited duration.   He retained the files at issue from late October 2007 until the end of January 2008.   For much of that time, the files sat unused in Mr. West's computer bag because he took two weeks vacation prior to starting his new job.   Thereafter, Mr. West referenced his old files only sporadically.   The limited duration of this crime becomes clear when one considers that Mr. West worked for Philips for eight years and had only recently joined Bridgelux before his crimes were discovered.

In addition to requiring little planning and being short-lived, Mr. West's crime was aberrant because it marked a one-time deviation from an otherwise law-abiding life.   Mr. West has no criminal history whatsoever. See PSR at ¶¶ 33 & 34.

Mr. West deserves a downward departure for aberrant behavior because his case is "exceptional."  Like the defendant in Mellert, Mr. West has an "outstanding employment record." See Exh. A [Mr. West's resume].   During his eight years at Philips, Mr. West generated 12 patents and 9 patent applications for the company. This included patents for: (1) Philips' leading product, a side-emitting LED; (2) the Luxeon Direct technology that enabled Philips to secure major deals to do backlighting for Sony and other companies; and (3) Philips' next-generation emitter technology, the Rebel product.   Both the Luxeon and Rebel products won awards for Philips. See Exh. B [Luxeon Award] & Exh. C [Rebel Award].   Although Mr. West lost his job at Bridgelux when his offense came to light, his immense talent as an engineer and manager remains undeniable.   Indeed, his current employer, Solarmation, snapped him up as soon as he left his previous employer even though Solarmation knew about this case.

Mr. West's motivation and efforts at mitigation also make his case exceptional. Mr. West did not act out of greed or any desire to harm Philips.   He rationalized that he was entitled to possess and reference Philips' confidential files because he had created them.   He thought he could use the files without harming Philips so long as he did not share any secret information with Bridgelux employees.   He conveniently, but understandably, ignored the fact that he himself had become a Bridgelux employee. This rationalization was criminal, but not malicious.   Moreover, Mr. West has evinced sincere remorse.   He mitigated his crimes by cooperating fully with the government,

STIPULATION AND [PROPOSED] ORDER TO CONTINUE - 4

quickly surrendering all confidential Philips' information in his possession, and making full restitution.

Mr. West's exceptional situation, coupled with the aberrant nature of his crime, merit a §5K2.20 downward departure.

**2.       Mr. West's extraordinary family circumstances warrant a downward departure.**

The guidelines permit a court to depart downward for extraordinary family circumstances when "defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the family" beyond that "ordinarily incident to incarceration." U.S.S.G. § 5H1.6 at note 1(B). Accordingly, the Ninth Circuit has repeatedly granted downward departures to defendants who have proven themselves to be "irreplaceable caregivers." See, e.g., United States v. Menyweather, 447 F.3d 625, 632-33 (9th Cir. 2006) (upholding downward departure based, in part, on defendant's role as single mother of an 11-year old).

A defendant can qualify as an essential caregiver under § 5H1.6 even if he is not his family's *only* caregiver. See, e.g., United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008) (affirming downward departure for "doting" father who shared custody of his 8-year old child with his ex-wife). Thus, in United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991), the court approved a downward departure for a defendant who had been married for 12 years and had worked two jobs to provide for his wife and two daughters, aged 4 and 11. The court described defendant as a "man who works hard to provide for his family." Id. But cf. United States v. Encinas, 225 Fed. Appx. 474, 476 (9th Cir. 2007) (denying downward departure to defendant where it appeared "highly unlikely" that he was supporting his children).

Here, Mr. West's family circumstances merit a downward departure. Like the defendant in Alba, Mr. West works hard to provide for his wife and two children, Justin, age nine, and Krista, age seven. See PSR at ¶ 40. He is the "primary breadwinner for his family." Id. at ¶ 74. His wife's part-time job yields less than one-eighth of Mr. West's salary. Id. at ¶ 55. Moreover, Mr. West devotes most of his spare time to his family. He works from home and routinely picks his children up from school.

A sentence of imprisonment would cause a "substantial, direct and specific" loss of caretaking for Mr. West's family. A four-month absence would deprive them of his company and at least four months of income. This would hit especially hard because Mr. West recently paid Philips $100,000 in restitution. Id. at ¶ 16.

Moreover, because Mr. West is not an American citizen, his imprisonment could cause his family even more devastating - - albeit indirect - - harm via deportation. Mr. West and his wife are Canadian citizens. They emigrated to the United States in 1999, and their children were both born and raised in this country. Id. at ¶¶ 40-41. Because Mr. West has permanent resident status, he is subject to deportation. According to Mr. West's immigration attorney, Saad Ahmad, "any actual jail time" would increase Mr. West's risk of being deported. See Exh. D [Ahmad opinion letter].

If the government deports Mr. West, his family would suffer substantial harm. Mr. West's wife and children would be forced to leave their home and friends. Mr. West would lose his high-paying job at Solarmation and would have to search for new work in Canada. Given Canada's weak market for Mr. West's skills and the horrendous state of the economy worldwide, Mr. West may not be able to find another position. Also, Mr. West would have an especially difficult time finding work because - - as a deported alien - - he would not be able to travel back to the United States, an essential part of most jobs in Canadian technology firms.

It is doubtful that Mrs. West would be able to make up the economic shortfall. Having taken off years to raise a family, Mrs. West may have trouble finding work in this economy. Also, as a school teacher, her income would be modest.

This parade of horribles - - loss of home, country, friends, and reliable sources of income - - are extraordinary circumstances not suffered by the families of similarly situated defendants. They make a downward departure appropriate in this case.

　　　　3.　　　　　**Mr. West deserves a downward departure because his deportability would make imprisonment atypically harsh for him.**

Sentencing courts can depart downward due to a defendant's status as a deportable alien if that status would render imprisonment "substantially" more severe for him than it is for other defendants. United States v. Charry Cubillos, 91 F.3d 1342, 1342-45 (9th Cir. 1996). The guidelines only prohibit such departures if a

crime "necessarily involves a defendant who is a deportable alien." See, e.g., United States v. Martinez-Ramos,184 F.3d 1055, 1058 (9th Cir. 1999) (no downward departure for deportability in illegal re-entry case).

Accordingly, in United States v. Pacheco-Soto, 386 F.Supp.2d 1198, 1205 (D.N.M. 2005), the court departed downward by two levels in a drug case because it found that the defendant's deportability would cause him to face an "unwarranted increase in the severity of his sentence." The court found that the defendant's deportability would render him ineligible for early release, would bar him from serving his sentence in a minimum security prison, and would prevent him from getting credits for participation in a rehabilitation program. Id.

Moreover, although a court cannot depart downward "solely" because of the threat of deportation, a court can base a downward departure on this threat in combination with other factors. United States v. Kwan, 407 F.3d 1005, 1017 (9th Cir. 2005). Indeed, "nothing in the Guidelines . . . forbids consideration of extralegal consequences that follow a sentence as grounds for a departure." United States v. Bautista, 258 F.3d 602 (7th Cir. 2001) (court could can base downward departure on collateral consequences of deportation in extraordinary cases).

Here, Mr. West's deportability merits a downward departure because it will render imprisonment substantially harsher for him than it is for other similarly situated defendants. As the courts have acknowledged, the Bureau of Prisons has "vast discretion" to determine the "appropriate conditions under which a prisoner shall serve his or her sentence." Lizarraga-Lopez v. United States, 89 F.Supp.2d 1166, 1169 (S.D.Cal. 2000). Although the Bureau would typically house a defendant with Mr. West's background in a minimum security facility or a community confinement center, Mr. West's deportability mandates that the Bureau place him in a low security level institution or someplace even harsher unless the Bureau chooses to make a special exception. See B.O.P. Program Statement 5100.07.

Also, as noted in the preceding section of this memorandum, imprisonment would have the collateral consequence of increasing Mr. West's chances of being deported. This would force Mr. West to uproot his family and leave his home. It would leave him jobless during one of the worst times in economic history. Moreover, because Mr.

West's employer, a startup, is highly dependent upon Mr. West, Mr. West's deportation could cause the company to fail.  This would leave others jobless too.

These indirect consequences, coupled with the substantial increase in severity that imprisonment would have for Mr. West solely because of his deportability, warrant a downward departure.

4.          **Mr. West deserves a downward departure because he has made extraordinary restitution and has cooperated fully with the government.**

The guidelines permit a two-level reduction for acceptance of responsibility where - - among other things - - a defendant truthfully admits to his conduct, terminates the conduct voluntarily, pays restitution, and assists authorities. See U.S.S.G. §3E1.1(a) at n.1.  In addition to this two-level reduction, a court can depart downward from the guidelines if a defendant makes extraordinary restitution. United States v. Miller, 991 F.2d 552, 553 (9th Cir. 1993), overruled on other grounds, United States v. Aguirre, 214 F.3d 1122, 1127 (9th Cir. 2000).  See also United States v. Garlich, 951 F.2d 161, 163 (8th Cir. 1991).  In gauging whether restitution is extraordinary, courts focus on voluntariness, the percentage of funds restored, timing, and whether the defendant has evinced "sincere remorse." United States v. Kim, 364 F.3d 1235, 1244 (11th Cir. 2004) (departing downward where defendant borrowed from others and liquidated her savings to pay restitution three months before sentencing).

Here, as the government and Probation Office agree, Mr. West deserves a 2-level reduction for extraordinary acceptance of responsibility. See Government Sentencing Memorandum at p. 2; PSR at ¶¶ 19 & 28.  Mr. West immediately confessed his crime when FBI agents searched his home on January 29, 2008. See PSR at ¶¶ 12-14.  A year later, on February 5, 2009, Mr. West paid Philips $100,000. Id. at ¶¶ 15 & 16.  Then, on March 3, 2009, Mr. West met with Philips and the government to tell them all he could about his offense and to identify all proprietary information in his possession. See Government Sentencing Memorandum at p. 2.  On March 9, 2009, Mr. West pled guilty.

Mr. West's extraordinary restitution itself merits a downward departure beyond the 2-level reduction under § 3E1.1.  Mr. West paid restitution voluntarily.  Although Philips filed suit against Mr. West, the case did not go far before the parties

1   settled.   Moreover, Mr. West paid Philips the full amount it claimed. See PSR at ¶ 17.
2   The timing of Mr. West's restitution was also extraordinary, coming more than a month
3   before his guilty plea.   Most importantly, Mr. West's restitution evinced sincere
4   remorse.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1                                CONCLUSION

2          Accordingly, Mr. West respectfully requests that the court depart downward from

3   the guidelines and sentence him to three years of probation with ten months of

4   electronic monitoring.

5
    Dated: June 8, 2009
6

7

8

9

10
                                    _____/S/_____
11
                                    PAUL B. MELTZER
12
                                    Attorney for Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: May_____, 2009                    LAW OFFICES OF PAUL B. MELTZER

_____

PAUL B. MELTZER, Attorney for
Defendant,

# Scott West

3393 Muscat Ct.
Pleasanton, CA 94566
(408) 722 - 1846
hellowests@hotmail.com

## CAREER OBJECTIVE

➢ A position of Director or project manager allowing me to leverage my leadership skills and expertise in high power packaging within the R&D or Product Development group.

## WORK EXPERIENCE

➢ **GreenVolts Inc**. (May '08 – Dec '08) – Concentrated Photovoltaic (CPV)
   **Director of Product Management**
   - Implemented and released the Module production line
   - Design and fabrication of key mfg. equipment
     - o MMT – Module tester for binning
     - o 30DOF – Method for active alignment of primary mirror to solar cell
   - Characterization – detailed system efficiency study
     - o Identified and quantified the key items which enable a 20% gain in efficiency
   - Research and development on the next generation CPV technology


➢ **Bridgelux Inc**. (Nov. '07 – Apr. '08) – High Power LEDs
   **Director of Product Development**
   - Implemented a formal Project Tracking Process – Start Phase => Product Release
   - Established partners and OEM relationships to manage risk and accelerate development
   - Built and motivated a talented multidiscipline team
   - Established the reliability and characterization strategy for New Product Introductions (NPI)
   - Established direction for Pilot line to accelerate package development
   - Invented and managed an innovative low cost High Power LED solution
   - Set direction for the development and manufacturing strategy for NPI
   - Applied in-depth understanding of Reliability, Characterization, Quality, FMEA, SPC, etc.
   - Managed the budget, project costs, product cost, CAPX, ROI, etc.
   - Executed the demanding items above in a positive, rewarding environment

➢ **Philips LumiLeds** (1999 – 2007) – High Power LEDs
   **Section Manager Product Development** (2004 – 2007)
   - Managed New Product Introductions (NPI) – both technology and platform based projects
   - Led a 25 person multidiscipline team (in the US and abroad)
   - Synthesized input form a wide variety of sources to drive prioritization for a highly technical team
   - Established relationships with vendors/customers from Asia and around the world
   - Relocated to Malaysia and to The Netherlands to support projects
   - Excelled at managing risk and keeping the projects on time and on budget
   - Implemented concise communication on the project status – timing/risks/issues/needs etc.

*Results*
- Successfully launched 3 major projects
- Managed up to 5 large projects simultaneously (>$5M per project)
- Invented, developed and released the Rebel product (high power LED)
  - ✓ Rebel won 2007 Light Fair award for Technical excellence!
- Invented and developed Luxeon Direct for backlights in large screen TV's
  - ✓ Luxeon Direct won 2004 Society of Information Displays (SID)

**Optical Design Engineer R&D** (2000 – 2004)
**Senior Field Application Engineer** (1999 - 2000)

➢ **Autosystems Manufacturing Inc., Belleville, Ontario** (1993 – 1999)
  **Advanced Engineering Manager** (1997 – 1999)
- R&D in the following areas :
  Advanced Lighting Systems – LED, HID lighting, Software development - ALDAP
  Advanced Materials – New polymers and monomers (non-outgassing substrates)
  Advanced Processes – Sputter, Vacuum Plasma Enhanced Topcoats
           - Install DynaMet 4V system

  **Coatings Technical Manager** (1993 – 1997)
- Managed technicians in the coating process of composite headlamp products
- Installed new coating equipment in excess of $5 million and perform continuous upgrades to existing processes of metallization of thin films, flow coating, parts cleaning systems
- Conducted R&D in polyester substrates and UV curable lacquer coatings
- Selected, tested and qualified advanced coating equipment
- Managed start-up of new facility and new coating equipment for composite headlamp products
- Managed the production, scrap reporting, and efficiencies for coatings

## PATENTS / APPLICATIONS / PAPERS / AWARDS

➢ 9 US patents, 7 US applications
➢ 4 papers on High power LEDs for Automotive and Display markets
➢ 2 awards from the Industry
      - SID Information Display award 2004 – Luxeon Direct used in flat panel TV's
      - LightFair award 2007 – Technical Excellence – Rebel product for high power LEDs

## EDUCATIONAL BACKGROUND

➢ Technical training - ASAP basic and advanced courses

➢ Bachelor of Science Honours, Mechanical Engineering, 4 Year Program
    Queen's University, Kingston, Ontario   (October 1992)

➢ Ontario Grade XIII Diploma, Ontario Scholar
    Port Perry High School, Port Perry, Ontario   (June 1988)

## COMPUTER SKILLS

➢ Computer Software:     ASAP – Optical simulation software (ray trace)
                                 CAD - Solid Designer, Rhinoceros

Microsoft Project, Office
Windows XP/Vista

## OUTSIDE INTERESTS

➢ Enjoy athletics – biking, volleyball, windsurfing, water-skiing, downhill skiing, snowmobiling
➢ Fishing, camping, home improvements, landscaping projects



# LUMILEDS™
LIGHT FROM SILICON VALLEY

**Press Contact:**
Jason Ovitt 847/415-9326
jovitt@sspr.com

## Lumileds™ Luxeon® LEDs for Backlights Wins SID/*Information Display* Award

### *Arrays Simplify LED Backlight Design and Assembly*

SAN JOSE, CA (June 3, 2005) --- Lumileds Lighting announced that its Luxeon LED array product for LCD backlights has received the Display Material/Component of the Year Silver Award in the 2004 SID/*Information Display Magazine* competition. The array, consisting of red, green and blue side-emitting Luxeon LEDs, is the first to enable LED-based backlight illumination systems that provide greatly improved color fidelity and other benefits over cold cathode fluorescent lamps (CCFLs).

"The use of high-power LEDs in backlights offers significant advantages ranging from never-before-possible color reproduction to dynamic color point control and mercury-free operation," said Mark Pugh, Lumileds VP of Business Development. "This recognition reflects Lumileds' achievement in developing systems and solutions using Luxeon LEDs that set the stage for bringing more LED-based backlights to market."



*Mike Holt, Lumileds CEO and Mark Pugh, VP Business Development receive the award from Dr. Ernst Lueder, Chair of the Display of the Year Awards*

In the case of the award-winning Luxeon, advances include a perpendicular LED beam pattern that makes the light produced by the red, green and blue emitters readily available for mixing to create the white light—consistent over time and temperature—necessary for backlight use; and consistent brightness and color uniformity achieved through exclusive intelligent binning;

The Display of the Year Award winners are selected by an international committee consisting of leading members of the technical display community and distinguished technology journalists.   The structure of the panel ensures that the committee's deliberations are carried out with both technical sophistication and broad perspective. The awards recognize major advances in the design and manufacture of displays used in television sets, notebook computers, desktop computer monitors, cellphones, PDAs, DVD players, and other electronic devices.

**About Lumileds Lighting**

Lumileds Lighting is the world's leading manufacturer of high-power LEDs and a pioneer in the use of solid-state lighting solutions for everyday purposes including automotive lighting, camera flash, LCD displays and televisions, portable lighting, projection and general lighting.   The company's patented Luxeon Power Light Sources are the first to combine the brightness of conventional lighting with the small footprint, long life and other advantages of LEDs.  Lumileds also supplies core LED material and LED packaging, and manufactures billions of LEDs annually. Lumileds Lighting is a joint venture between Agilent Technologies and Philips Lighting.  The company is headquartered in San Jose, California, with operations in the Netherlands, Japan and Malaysia and sales offices throughout the world.   For more information, call Lumileds at 408-435-6111 or visit www.lumileds.com.

# # #



Press Information

May 12, 2009

## LUXEON REBEL ES RECOGNIZED WITH TECHNICAL INNOVATION AWARD AT LIGHTFAIR 2009 IN NEW YORK CITY

*Technical Innovation Award recognizes the best leap forward in lighting technology*

SAN JOSE, CA — LUXEON® Rebel ES, the latest proliferation of the LUXEON Rebel family of power LEDs, was recognized last week with the LFI Technical Innovation Award at Lightfair 2009. The LFI Innovation Awards honors industry innovations for lighting-related products. This year, there were more than 200 entries, each evaluated by an independent panel of renowned lighting professionals. LUXEON Rebel ES, which is the first product that is specified to deliver a minimum of 100 lumens per watt, was selected for its "leap forward in lighting technology".

LUXEON Rebel products are already known for their extremely small size, high-light output, long-useful life and ruggedness. LUXEON Rebel ES retains all these benefits while also offering:

- Specified 100 lumen per watt performance.
- A path to minimizing energy consumption and reducing our carbon footprint.
- Simpler LED selection to speed design and manufacturing and to lower development costs.
- Robust performance over temperature to reduce efficacy and light output fluctuation.

More information about LUXEON Rebel ES can be found at www.philipslumileds.com.

### Availability
LUXEON Rebel ES is available from Future Lighting Solutions (www.futurelightingsolutions.com) with standard lead times. Future is the exclusive provider of LUXEON power LEDs and a strategic partner dedicated to making it easier for luminaire manufacturers to develop solid-state lighting solutions.





**About Philips Lumileds**

Philips Lumileds is the world's leading provider of power LEDs for everyday lighting applications. The company's recent records for light output, efficacy and thermal management are direct results of the ongoing commitment to advancing solid-state lighting technology and enabling lighting solutions that are more environmentally friendly, help reduce $CO_2$ emissions and reduce the need for power plant expansion. Philips Lumileds' LUXEON LEDs are enabling never before possible applications in hospitality, outdoor lighting, retail lighting and in homes.  More information about the company's LUXEON LED products and solid-state lighting technologies can be found at www.philipslumileds.com.

**About Royal Philips Electronics**

Royal Philips Electronics of the Netherlands (NYSE: PHG, AEX: PHI) is a diversified Health and Well-being company, focused on improving people's lives through timely innovations. As a world leader in healthcare, lifestyle and lighting, Philips integrates technologies and design into people-centric solutions, based on fundamental customer insights and the brand promise of "sense and simplicity". Headquartered in the Netherlands, Philips employs approximately 116,000 employees in more than 60 countries worldwide. With sales of EUR 26 billion in 2008, the company is a market leader in cardiac care, acute care and home healthcare, energy efficient lighting solutions and new lighting applications, as well as lifestyle products for personal well-being and pleasure with strong leadership positions in flat TV, male shaving and grooming, portable entertainment and oral healthcare. News from Philips is located at www.philips.com/newscenter.


For further information contact:
Heather Kelly, SSPR
heather@sspr.com
+1 719-634-8274

Tracy Annandale, TKO
tracy@tko.co.uk
+44 (0)1444 473555



# SAAD AHMAD & ASSOCIATES

39159 Paseo Padre Pkwy, Suite 307 Fremont, California 94538

Telephone: 510 713 9847
Saad Ahmad*
* Licensed in Massachusetts

Facsimile: 510 713 9850
Robert L. Volz **
** Licensed in California

---

## CONFIDENTIAL

**THIS TRANSMISSION IS THE PROPERTY OF THE SENDER AND IS INTENDED ONLY FOR THE PERSON NAMED. THIS TRANSMISSION MAY CONTAIN CONFIDENTIAL INFORMATION AND MAY BE A PRIVILEGED COMMUNICATION. IF YOU HAVE RECEIVED THIS IN ERROR, PLEASE CONTACT THIS OFFICE IMMEDIATELY.**

## MEMORANDUM REGARDING FAX TRANSMITTAL

DATE:     April 14, 2009

TO:       Paul B. Meltzer, Esq.

FAX NO:   (831) 426-2749

FROM:     Saad Ahmad, Esq.

NUMBER OF PAGES INCLUDING THIS ONE: 3
RESPOND TO: FAX: 510-713-9850 or Phone: 510-713-9847
REMARKS (IF ANY): **ROBERT WEST/ PROBATION LETTER**

Hello Paul:

I hope you are well. I am faxing a draft of the letter you requested. Please let me know if this works for you or you need more details or would like me to change anything.

Saad

## SAAD AHMAD & ASSOCIATES

39159 Paseo Padre Parkway, Suite 307 Fremont, California 94538

Telephone: 510 713 9847
Saad Ahmad*
* Licensed in Massachusetts

Facsimile: 510 713 9850
Robert L. Volz **
** Licensed in California

April 14, 2009

Paul B. Meltzer, Esq.
515 Water Street
Santa Cruz, California 95060

### RE:   ROBERT SCOTT WEST

Dear Mr. Meltzer:

Thank you, for contacting me to discuss your client, Mr. Robert Scott West (hereinafter "Mr. West")'s immigration status. Mr. West is a native and citizen of Canada, and a lawful permanent resident of the United States since 2006. In order to protect Ms. West from any serious immigration consequences resulting from his guilty plea to theft in violation of 18 U.S.C. §1832(a)(3), I strongly advice that Mr. West not serve any jail time. Although Mr. West has resided lawfully in the United States since 1999, he did not become a lawful permanent resident until 2006. Based on his recent lawful permanent residence in this country, it is important that Mr. West establishes evidence of rehabilitation from his past criminal conduct as well as establishes more positive equities in the United States. Home confinement or some other form of restraint on liberty is a far better option than actual jail time because it would allow Mr. West to be continually employed and support his family. Mr. West's ability to financially support his family, which includes children born in the United States, is a very important factor in his ability to convince an Immigration Judge to allow him to stay in this country.

Based on the length of time Mr. West has resided in the United States, he is potentially eligible for at least two forms of discretionary relief from deportation—cancellation of removal under section 240A(a) of the Immigration & Nationality Act (hereinafter "INA") and relief under INA §212(H). Both forms of relief, however, require an alien, such as Mr. West, to establish that his or her removal would not be in the best interest of the United States.

In exercising discretion under these sections of the law, an Immigration Judge balances the alien's undesirability as a lawful permanent resident with the social and humane considerations present in the case. The adverse factors may include: (1) the nature and underlying circumstances of the criminal conviction; (2) the nature, seriousness, and recency of the any criminal record; and (3) other evidence of bad character or undesirability as a lawful permanent resident. The favorable factors may include: (1) family ties in the United States; (2) residence of long duration in this country; (3) evidence of hardship to alien of family if deportation occurs; (4) a stable employment history; (5) the existence of property or business ties; (6) evidence of value and service to the community; and (7) other evidence of the alien's good character.

I believe that the best course action for Mr. West's immigration prospects in this country would be to avoid any actual jail time. This would allow Mr. West to further build the equities he needs in order to stay in this country. Please contact me if you have any more questions or concerns.

1

Sincerely,

Saad Ahmad
Attorney at Law
State Bar of Massachusetts No: 646745